# Illinois Official Reports

## Appellate Court

---

### *Freedman v. Muller*, 2015 IL App (1st) 141410

---

| | |
|---|---|
| Appellate Court Caption | CARMELA FREEDMAN, Plaintiff-Appellant, v. MICHAEL MULLER, Defendant-Appellee. |
| District & No. | First District, First Division<br>Docket No. 1-14-1410 |
| Filed | June 30, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-L-11633; the Hon. Sanjay T. Tailor, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Mark T. Neil, of Mark T. Neil & Associates, of Chicago, for appellant.<br><br>Alvin R. Becker and Matthew D. Elster, both of Beermann Pritikin Mirabelli Swerdlove LLP, of Chicago, for appellee. |
| Panel | JUSTICE CONNORS delivered the judgment of the court, with opinion.<br>Presiding Justice Delort and Justice Cunningham concurred in the judgment and opinion. |

**OPINION**

¶ 1 Plaintiff, Carmela Freedman, appeals from an order of the circuit court that dismissed a claim for palimony in Freedman's second amended complaint pursuant to section 2-615 of the Code of Civil Procedure (the Code) (735 ILCS 5/2-615 (West 2012)). Freedman asserted this claim against Michael Muller, with whom Freedman had been romantically involved for a number of years. On appeal, Freedman contends that dismissal of the palimony claim was improper because unmarried cohabitants should have recognized property rights and the case that the court relied on, *Hewitt v. Hewitt*, 77 Ill. 2d 49 (1979), is based on foundations that have either been repealed or are not reflective of current society. We affirm.

¶ 2 This appeal concerns Freedman's second amended complaint (complaint), which was filed on October 23, 2013. In addition to the palimony claim, Freedman's complaint also asserted causes of action for constructive trust, unjust enrichment, quantum meruit, implied contract, and promissory estoppel. Only the palimony claim is at issue in this appeal.

¶ 3 In her complaint, Freedman, a professional hairdresser, stated that beginning in 1998, she and Muller, a "wealthy businessman and public figure" who owned several car dealerships, began a "long term intimate and confidential relationship as cohabitants." Freedman also stated that although defendant was legally separated from his wife and told Freedman he would never divorce his wife, Freedman and Muller "lived a life for more than a decade as any married couple would." According to Freedman, she and Muller lived together, traveled together, and socialized with one another's friends, families, and acquaintances. Freedman stated that during their relationship, she and Muller lived either at her house in Northbrook or at Muller's apartment in Chicago. Further, Muller paid for all expenses associated with travel and their social life, as well as certain of Freedman's home expenses.

¶ 4 Freedman alleged that sometime in 2003, Muller convinced her to transfer her Northbrook house to him based on Muller's misrepresentation that he would either transfer the title back to Freedman and pay all the expenses and maintenance on the house, or buy her a larger, more valuable replacement property for approximately $650,000. Freedman stated that, ultimately, Muller became the sole owner of the house by paying off the outstanding mortgage and taking the title in his name. According to Freedman, because of this transaction, she lost title to the house and approximately $10,000 in equity in the property. Freedman additionally stated that after Muller acquired title to the home, he demanded that Freedman remove her belongings from the house because he was going to start renovations and buy new furniture.

¶ 5 Freedman further stated that in late 2003 or early 2004, Muller convinced Freedman to move into his Chicago apartment. According to Freedman, Muller also insisted that she cut back the time she spent as a hairdresser "since [Muller] wanted [Freedman] to be available at his beck and call." Freedman agreed to this and "significantly reduced the time spent in her business."

¶ 6 Freedman's complaint also included allegations about her condominium in Chicago, which until 2005, she had rented to third parties as a source of income. Freedman stated that in February 2005, Muller convinced her to sell the condominium and misrepresented to her that if she did so, he would buy her a three- to six-unit building that she would manage and own. However, this replacement property was never purchased. Freedman also stated that when she sold the condominium, Muller also promised to buy her another condominium for as much as $650,000, but this never occurred either.

¶ 7    Freedman additionally alleged in her complaint that she had twice cared for Muller when he was ill. In 1998, when Muller was diagnosed with esophageal cancer, Freedman oversaw Muller's care and rehabilitation, and continued to obtain certain enzymes and antioxidants for him through January 2013. According to Freedman, after Muller was cured, he made Freedman promise that she would groom and cut his hair and take care of his medical care, health care, and personal needs. Freedman also stated that in August 2011, Muller had surgery after it was discovered that he had a lung tumor. At that time, Muller convinced Freedman that if she would take care of him physically and emotionally, he would take care of her financially. Freedman agreed and placed Muller "on a regime of Protesase after his surgery." Freedman alleged that Muller declined to put his promises in writing and failed to follow through on those promises.

¶ 8    Freedman also alleged that during their relationship, she and Muller developed a business and personal relationship with the chief executive officer of Honda and that, thanks in part to Freedman's efforts, Muller was awarded a car dealership in Indiana.

¶ 9    Additionally, Freedman's complaint included allegations about Freedman and Muller's various breakups and attempts to reconcile. According to Freedman, in June 2008, Muller told Freedman he was ending their relationship, and a week later, he told Freedman he was living with another woman. However, in October 2008, "[a]s an inducement to reconcile," Muller told Freedman that: (1) he had opened a bank account in both of their names; (2) he was buying $30,000 worth of Ford stock and would buy $30,000 each of GMAC and Citibank stock for her; and (3) he would transfer title to Freedman's home to her because he had not bought a replacement property. Freedman stated that she agreed to reconcile based on Muller's representations, but other than opening the bank account, Muller did not follow through on his other promises.

¶ 10    Freedman stated that in 2009, she learned that Muller had been sexually involved with other women. According to Freedman, from that point until October 2012, "when [they] finally terminated their sexual and intimate relationship," their relationship was "off and on." Freedman stated that in August 2011, Muller again sought to reconcile with her "by promising certain financial benefits." According to Freedman, Muller promised to: (1) transfer the title to Freedman's home back to her or purchase a replacement property worth $650,000; (2) transfer title of two condominium units to her or provide title to residential real estate worth $650,000; (3) buy Freedman a multifamily apartment building worth $850,000; (4) provide major health insurance; (5) provide cars as necessary and pay for all attendant costs to maintain the cars, such as insurance; (6) transfer to Freedman the number of shares of Ford stock that could be bought for $30,000 in October 2008; (7) transfer to Freedman the number of Citibank shares that could have been bought for $30,000 in October 2008; and (8) transfer to Freedman the number of shares of GMAC stock that could have been purchased for $30,000 in October 2008. Freedman stated that Muller refused to sign an agreement to memorialize these promises.

¶ 11    Freedman additionally alleged that over a year later, in October 2012, Muller again made a series of promises that were never fulfilled. Specifically, Muller promised Freedman that he would: (1) transfer title back to Freedman's home or buy a replacement property for approximately $650,000; (2) buy a multifamily apartment building worth approximately $850,000 for Freedman to own and operate; (3) pay for Freedman's health care expenses and health insurance; (4) transfer $30,000 worth of Ford stock, $30,000 worth of GMAC stock, and

$30,000 of Citibank stock to Freedman; and (5) provide a new car and pay for related expenses.

¶ 12   Freedman stated that at all times, including after their most recent breakup, Muller had insisted that Freedman agree to take care of his medical and emotional needs and continue to be his hairdresser. Freedman agreed and continued to provide these services. Freedman also stated that while the suit had been pending, Muller had seized a 2007 Honda that Muller had provided for her and that Muller sought to evict Freedman from her home in a separate proceeding.

¶ 13   Following these factual allegations, Freedman presented seven claims against Muller. Count I, titled "PALIMONY CLAIM," incorporated the factual allegations above and stated that Freedman and Muller had "cohabited and lived in a marital like relationship" for 10 years continuously "and then off and on" for an additional 4 years. Freedman further alleged that "[c]ertain courts have recognized property rights that unmarried cohabitants have upon dissolution of their relationship." As relief, Freedman sought "an award of one-half of what [Muller] earned while they were in their intimate marital like relationship and for such other relief as this Court deems just and equitable." In addition to the palimony claim, Freedman alleged claims against Muller for constructive trust based on fraud, constructive trust based on a breach of a confidential and fiduciary relationship, unjust enrichment, *quantum meruit*, implied contract, and promissory estoppel.

¶ 14   On December 9, 2013, Muller filed a motion to dismiss Freedman's complaint. In addition to asserting that the other counts should be dismissed, Muller contended that the palimony claim should be dismissed pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2012)) because Illinois does not recognize a cause of action for palimony. Muller stated that the "[c]ertain courts" that Freedman referred to in her complaint are outside Illinois and that in *Hewitt v. Hewitt*, 77 Ill. 2d 49 (1979), the Illinois Supreme Court stated that claims for palimony were unenforceable. Muller further asserted that even if Illinois recognized the property rights of unmarried cohabitants, Freedman acknowledged that Muller remained married, and therefore, relief would be unavailable to her.

¶ 15   In response, Freedman noted that despite *Hewitt* and other cases that followed its holding, other Illinois courts recognized that unmarried cohabitants had property rights in assets accumulated during the relationship. Freedman additionally contended that when *Hewitt* was decided, "public policy regarding traditional marriage was in a decidedly different place than it is in 2014," and referred to appended exhibits that consisted of three census-related documents. Freedman further asserted that "many jurisdictions have recognized property rights to parties in formerly unmarried partner relationships." As to Muller's claim that relief would nonetheless be unavailable because Muller had been married during the relevant period, Freedman stated that Muller had still maintained a 14-year marital-like relationship with Freedman as a cohabitant.

¶ 16   Oral argument was held on Muller's motion to dismiss on April 17, 2014. Counsel for Freedman acknowledged that many of the "palimony cases" cited the types of remedies contained in the other counts of Freedman's complaint and stated that "[t]here has historically not been a count called palimony." The court stated that it was bound by *Hewitt* and that there was no cause of action for palimony in Illinois. The court ultimately dismissed the palimony claim, but denied the motion to dismiss as to Freedman's other claims. The court's order included a finding pursuant to Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010), stating

- 4 -

there was no just reason to delay the enforcement or appeal, or both, of the dismissal of count I of Freedman's complaint.

¶ 17    On appeal, Freedman contends that *Hewitt*, which was the basis for the circuit court's ruling, should be modified or overturned because that case was based on foundations that have either been repealed or are not reflective of current society. Freedman points to other jurisdictions that have held that unmarried cohabitants have property rights, subject to meeting burdens of proof, and asserts that several jurisdictions have specifically criticized or rejected *Hewitt*. Freedman also argues that *Blumenthal v. Brewer*, 2014 IL App (1st) 132250, *appeal allowed*, No. 118781 (Ill. Mar. 25, 2015), which Freedman states repudiated *Hewitt*, provides support for her position that the property rights of unmarried people in marital-like relationships must be protected.

¶ 18    As a preliminary matter, Muller contends that Freedman's opening brief failed to comply with the certain supreme court rules and should be stricken. Muller asserts that Freedman's jurisdictional statement, statement of the case, argument section, and appendix are deficient, and accordingly, this court should strike Freedman's brief in its entirety.

¶ 19    We agree that Freedman's brief is deficient in certain respects, but we decline to strike it. In her jurisdictional statement, Freedman states, "This is an appeal from the granting of Muller's Motion to Dismiss Count I of Freedman's Second Amended Complaint. The trial court, in its discretion and with agreement of the parties, granted Freedman's appeal of that dismissal pursuant to Supreme Court Rule 304(a)." Under Illinois Supreme Court Rule 341(h)(4)(ii) (eff. Feb. 6, 2013), the jurisdictional statement should include a brief statement or explanation of the basis for the appeal, including the rule or other law that confers jurisdiction, the facts of the case that bring it within the rule or law, the date that the order being appealed was entered, and any other facts that are necessary to demonstrate that the appeal is timely. Additionally, the facts in the jurisdictional statement should be supported by page references to the record on appeal. *Id.* Of these requirements, Freedman failed to include the date that the order being appealed was entered, the additional facts that would show her appeal is timely, and references to pages in the record.[1]

¶ 20    We next consider Freedman's statement of facts and argument sections. Illinois Supreme Court Rule 341(h)(6) (eff. Feb. 6, 2013) requires that a statement of facts "contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment, and with appropriate reference to the pages of the record on appeal." While Freedman accurately and fairly stated most of the facts, she failed to include some key details, such as that the facts recounted were contained in her second amended complaint, as well as what transpired at the argument on Muller's motion to dismiss. Muller also contends that the bulk of Freedman's argument section consists of fragmented citations to out-of-state cases that support the abandonment of *Hewitt*, a case that Muller contends is inapplicable. Putting aside the substance of Freedman's argument for the moment, we note that "[c]itation of numerous authorities in support of the same point"–as Freedman did at various times–"is not favored." Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013).

¶ 21    Lastly, we consider Freedman's appendix. An appendix to the appellant's brief must include a table of contents, a copy of the judgment appealed from, any opinion, memorandum,

_____

[1]We note that the court entered its Rule 304(a) finding on April 17, 2014, and Freedman timely filed her notice of appeal on May 14, 2014.

- 5 -

or findings of fact filed or entered by the trial judge, any pleadings or other materials from the record that are the basis of the appeal or pertinent to it, the notice of appeal, and a complete table of contents, with page references, of the record on appeal. Ill. S. Ct. R. 342(a) (eff. Jan. 1, 2005). Instead of fulfilling these requirements, the appendix to Freedman's opening brief consists of six exhibits that include census-related information, a report from the Bureau of Labor Statistics, copies of statutes, and a map showing a national chart of same-sex marriage. An incomplete copy of Freedman's complaint is appended to her reply brief. We will not consider any documents that were not presented to the circuit court or any references to those documents on appeal. See *People v. Reimolds*, 92 Ill. 2d 101, 106-07 (1982) (a court of review must determine the issues before it solely on the basis of the record made in the trial court).

¶ 22 We caution that the rules of procedure for appellate briefs are rules, not mere suggestions, and it is within our discretion to strike a brief and dismiss an appeal for failure to comply with the rules. *Parkway Bank & Trust Co. v. Korzen*, 2013 IL App (1st) 130380, ¶ 10. However, we will not strike Freedman's brief because Freedman's brief is adequate in other respects and the deficiencies noted above do not hinder our ability to review the issues at hand. See *Spangenberg v. Verner*, 321 Ill. App. 3d 429, 432 (2001) (declining to strike brief where it complied with the rules in other ways and none of the violations were so flagrant as to hinder or preclude review).

¶ 23 Turning to the merits, this appeal is from the grant of a motion to dismiss pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2012)), which challenges the legal sufficiency of a complaint based on defects apparent on its face. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006). On review, the question is "whether the allegations of the complaint, when construed in the light most favorable to the plaintiff, are sufficient to establish a cause of action upon which relief may be granted." (Internal quotation marks omitted.) *Karas v. Strevell*, 227 Ill. 2d 440, 451 (2008). "In reviewing the sufficiency of a complaint, we accept as true all well-pleaded facts and all reasonable inferences that may be drawn from those facts." *Marshall*, 222 Ill. 2d at 429. A cause of action should not be dismissed unless it is clearly apparent that no set of facts can be proven that would entitle the plaintiff to recover. *Id*. Although a complaint does not need to contain evidence, it cannot be merely conclusory, and must allege facts sufficient to bring a claim within a legally recognized cause of action. *Redelmann v. Claire-Sprayway, Inc.*, 375 Ill. App. 3d 912, 921 (2007). The standard of review for a motion to dismiss brought under section 2-615 is *de novo*. *Karas*, 227 Ill. 2d at 451.

¶ 24 Much of Freedman's argument is devoted to contending that *Hewitt* should be modified or abandoned. However, *Hewitt* is no longer good law. See *Blumenthal*, 2014 IL App (1st) 132250. As background, in *Hewitt*, the plaintiff, Victoria Hewitt, sought certain relief once her unmarried, family-like relationship with the defendant, Robert Hewitt, ended. *Hewitt*, 77 Ill. 2d at 52. Victoria contended that because Robert promised he would share his life, future, earnings, and property with her and because all of Robert's property resulted from the parties' joint endeavors, she was entitled to a one-half share. *Id*. at 53. Victoria also pursued causes of action based on an implied contract, constructive trust, and unjust enrichment. *Id*. The court found that Victoria's claims were unenforceable because they contravened the public policy "implicit in the statutory scheme of the Illinois Marriage and Dissolution of Marriage Act, disfavoring the grant of mutually enforceable property rights to knowingly unmarried cohabitants." *Id*. at 66. According to the court, a contrary result would reinstate common law marriage, which was outlawed in 1905. *Id*. at 65.

¶ 25    As Freedman acknowledges in her reply brief, *Hewitt* was essentially rejected in *Blumenthal*, 2014 IL App (1st) 132250. There, Brewer, who had been in a domestic partnership with Blumenthal since 1981 or 1982, asserted claims against her former domestic partner that included constructive trust, *quantum meruit*, and restitution. *Id.* ¶¶ 3, 11. The court found that after the Illinois legislature repealed the language that criminalized cohabitation in 1990, "the primary basis for the result in *Hewitt*–that agreements between unmarried parties are not enforceable because their relationship is illicit–ceased to exist." *Id.* ¶ 25. The court further stated that "United States courts are increasingly inclined to enforce agreements between former cohabitants" and pointed out other changes and notable cases since *Hewitt*. *Id.* ¶¶ 30, 33-34. Additionally, the court noted that Brewer alleged "that the couple intentionally comingled and shared their assets based on a mutual commitment and expectation of a lifelong relationship, that they divided their domestic and work responsibilities to best provide for the three children they had together, and that neither partner intended for their decisions and family roles to leave Brewer at a financial disadvantage later in life." *Id.* ¶ 35. Significantly, the court stated that Brewer was not bringing a statutory claim or asking the court to give her a new legal status or descriptive title, but rather "wants only to bring common law claims that are available to other people." *Id.* ¶ 38. Overall, *Blumenthal* appears to reject *Hewitt* and permits unmarried cohabitants to bring common law claims against each other.

¶ 26    Freedman repeatedly contends that unmarried cohabitants should have property rights. What Freedman fails to grasp is that based on *Blumenthal*, unmarried cohabitants do have property rights, and can enforce them using common law claims. However, Freedman's claim for palimony is insufficient because it consists of a bare request for half of Muller's earnings accumulated during their relationship, without any reference to a common law claim that could lead to such relief. This prevents her claim from being a legally recognized cause of action in Illinois. Her palimony claim incorporates 23 paragraphs of factual allegations and statements, states that the parties "cohabited and lived in a marital like relationship" for 10 years continuously and then on-and-off for 4 years, and asserts that "[c]ertain courts have recognized property rights that unmarried cohabitants have upon dissolution of their relationship." Freedman has not stated what property rights, if any, she has in half of Muller's earnings.

¶ 27    Out-of-state jurisdictions, heavily relied upon by Freedman, also do not allow for a palimony claim as framed in her complaint. Freedman's cited cases involve equitable grounds or a promise or agreement, whether express or implied, concerning the property at issue. In *Marvin v. Marvin*, 557 P.2d 106, 116 (Cal. 1976), the court found that "adults who voluntarily live together and engage in sexual relations are nonetheless as competent as any other persons to contract respecting their earnings and property rights" and noted that the plaintiff had alleged that the parties "agreed to pool their earnings, *** contracted to share equally in all property acquired, and that [the] defendant agreed to support plaintiff." In *Glasgo v. Glasgo*, 410 N.E.2d 1325, 1327, 1331 (Ind. Ct. App. 1980), the court stated that recovery for unmarried people "would be based only upon legally viable contractual and/or equitable grounds which the parties could establish according to their own particular circumstances," and noted that the plaintiff "invoked both contractual and equitable grounds" for relief. See also *Wood v. Collins*, 812 P.2d 951, 956 (Alaska 1991) ("[p]roperty accumulated before separation should be divided by determining the express or implied intent of the parties"); *Boland v. Catalano*, 521 A.2d 142, 145 (Conn. 1987) (stating that cohabitation alone does not create a contractual relationship or impose other legal duties on the parties, but that "[o]rdinary contract principles

are not suspended *** for unmarried persons living together"); *Crossen v. Feldman*, 673 So. 2d 903, 903 (Fla. Dist. Ct. App. 1996) (where woman sought to enforce oral contract for support during pregnancy and for a reasonable time thereafter, court stated "this case simply involves whether these parties entered into a contract for support, which is something they are legally capable of doing"); *Hudson v. DeLonjay*, 732 S.W.2d 922, 927 (Mo. Ct. App. 1987) (noting that the relevant inquiry was whether there was an agreement, either express or implied in fact, which was supported by valid consideration and stating that the defendant argued that she and the plaintiff had an express agreement to pool resources and share assets, or in the alternative, that the court could find an implied-in-fact contract from the parties' conduct); *Connell v. Diehl*, 938 A.2d 143, 153 (N.J. Super. Ct. App. Div. 2008) (to establish *prima facie* case for palimony, one required element is that the defendant promised the plaintiff he or she would support him or her for life).

¶ 28        Thus, both in Illinois and in other jurisdictions, parties have mutually enforceable property rights. However, Freedman's palimony claim sought one-half of Muller's earnings without asserting any equitable claim or any sort of promise or agreement that would lead to that relief. To be sure, Freedman's complaint notes various financial promises made by Muller. According to Freedman, when it was discovered that Muller had a lung tumor, he convinced her that if she would take care of him physically and emotionally, he would take care of Freedman financially. However, this promise was made in the context of taking care of Muller's health, and we fail to see the connection between this promise and a claim for one-half of Muller's earnings. Freedman's complaint also describes other promises Muller allegedly made, such as buying her stock and properties. Although Freedman initially states in her reply brief that these promises would have amounted to financial support for the rest of her life, she later states in her reply brief that the complaint "does not plead a lifetime promise of support." As such, Muller's other promises also do not amount to an agreement for one-half of Muller's earnings. Overall, Freedman fails to point to any connection between her factual allegations and her requested remedy of one-half of Muller's income, other than their relationship itself. Because an agreement or promise or an equitable claim is necessary for Freedman to enforce a property right against Muller, and her palimony claim does not include those elements, her palimony claim failed to allege facts sufficient to bring her claim within a legally recognized cause of action, and was properly dismissed. See *Redelmann*, 375 Ill. App. 3d at 921.

¶ 29        As an additional concern, if Freedman's palimony claim went forward, we would be creating an entirely new avenue for relief for unmarried cohabitants. We believe this is a task for the General Assembly, which has a superior ability to gather and synthesize data and is the "only entity with the power to weigh and properly balance the many competing societal, economic, and policy considerations involved." *Charles v. Seigfried*, 165 Ill. 2d 482, 493 (1995). However, we note that Freedman is not left without any potential relief, as her six common law claims against Muller survived the motion to dismiss.

¶ 30        Freedman additionally contends that *Hewitt*'s refusal to recognize rights for unmarried partners while the law recognizes other relationships violates the equal protection and due process clauses of the United States and Illinois Constitutions. Given *Blumenthal*'s rejection of *Hewitt* and recognition of mutually enforceable property rights, Freedman's contention is no longer relevant. Nonetheless, we agree with Muller that Freedman waived this issue by not raising it in the circuit court. Generally, reviewing courts will not rule on constitutional issues

unless they were raised and passed upon by the trial court. *Saunders v. Michigan Avenue National Bank*, 278 Ill. App. 3d 307, 311 (1996).

¶ 31   For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 32   Affirmed.