NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (4th) 240879-U

NO. 4-24-0879

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 11, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* G.A., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | No. 22JA176 |
| v. | ) | |
| Samantha A., | ) | Honorable |
| Respondent-Appellant). | ) | Karen S. Tharp, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Zenoff and Doherty concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, finding the trial court's findings regarding respondent's fitness and the minor's best interest were not against the manifest weight of the evidence, the court did not err in declining to give respondent's drug tests from an alternative site more weight than the results obtained from the approved site, respondent was given a fair opportunity to complete the required services, and respondent's due process rights were not violated when her visitation privileges were suspended.

¶ 2    In September 2022, the State filed a petition for adjudication of neglect regarding G.A. (born January 2022), the minor child of respondent, Samantha A., which the trial court granted. In January 2024, the State moved to terminate respondent's parental rights. The court found respondent unfit and that it was in G.A.'s best interest to terminate respondent's parental rights. Respondent appeals, arguing (1) the court's unfitness finding was against the manifest weight of the evidence, (2) the court erred in finding termination of her parental rights was in G.A.'s best interest, (3) the court erred in relying on unverified drug tests from the Illinois

Department of Children and Family Services (DCFS), (4) respondent was not given a fair opportunity to complete the requisite services, and (5) respondent's due process rights were violated when her visitation privileges were suspended without a judicial hearing. We affirm.

¶ 3                                I. BACKGROUND

¶ 4            On September 2, 2022, the State filed a petition alleging G.A. was a neglected minor whose environment was injurious to his welfare pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2022)), citing, *inter alia*, domestic violence between respondent and her paramour and respondent's drug use. On the same day, the trial court conducted a hearing and entered a shelter care order finding probable cause existed to believe G.A. was neglected.

¶ 5            On March 15, 2023, the trial court adjudged G.A. neglected, made him a ward of the court, and placed his custody with DCFS.

¶ 6            On January 8, 2024, the State moved to terminate respondent's parental rights, alleging respondent abandoned G.A., deserted him for more than three months prior to the filing of the motion, failed to maintain a reasonable degree of interest, concern, or responsibility regarding his welfare, failed to make reasonable efforts to correct the conditions which were the basis for G.A.'s removal during the nine-month period from March 15, 2023, to December 15, 2023, and failed to make reasonable progress toward G.A.'s return to her during the same nine-month period. 750 ILCS 50/1(D)(a), (b), (m)(i)-(ii) (West 2022).

¶ 7            On May 30, 2024, and June 14, 2024, the trial court conducted a fitness hearing. Lauren Masten, a Family Services Center supervisor overseeing G.A.'s case from December 2022 until April 2023, testified she authored service plans on January 11, 2023, and March 30, 2023, which were given to respondent. Respondent was required to engage in domestic violence

counseling, complete substance abuse treatment, comply with random drug drops, cooperate with DCFS, maintain appropriate housing, and sustain a source of income. Respondent was aware of the services she needed to complete to regain custody of G.A. From January 2023 through March 2023, respondent attended 2 out of 10 scheduled drug drops. Respondent tested positive for methamphetamine both times, and she tested positive for opiates once. Respondent claimed her heart medication caused the positive test results, but she did not provide a doctor's note confirming this assertion when asked. Respondent repeatedly insisted she was not using drugs.

¶ 8　　　　Respondent was referred to The Parent Place for parenting classes, but she did not complete those classes. Respondent attended an initial intake appointment, at the Survivor Recovery Center, which provides therapeutic services for victims of domestic violence, but the center determined she did not need services based on what respondent self-reported. Respondent "completed some sessions" for domestic violence before being discharged for no longer meeting the requirements. Masten testified respondent was not close to regaining custody of G.A. because she continued to have positive drug tests and did not complete any of the required services.

¶ 9　　　　Melissa Pease, a supervisor with Family Service Center, testified she was assigned to G.A.'s case from May 2023 until the time of the hearing. Pease testified G.A.'s umbilical cord blood tested positive for amphetamines and methamphetamine. Pease authored several service plans requiring respondent to cooperate with DCFS, complete parenting classes, take a substance abuse assessment and engage in treatment, and obtain domestic violence therapy for victims, as well as maintain housing and income. Pease had child and family team meetings with respondent to ensure she knew what services she needed to complete and why those services were necessary. None of the service plans were completed satisfactorily.

¶ 10　　　　Respondent was unsuccessfully discharged from parenting classes in March 2023

and July 2023 for attendance violations. According to the parent coach who interacted with respondent, respondent's behavior was erratic, and "she needed to get her mental health under control" before she could benefit from parent coaching. Respondent completed a substance abuse assessment, which recommended she complete outpatient services, but Pease received no documentation indicating respondent engaged in or completed those services. When Pease called the agency, they said respondent "was not in their system as completing it." Pease likewise did not have any confirmation respondent completed any services at Family Guidance Centers, Inc., and respondent only completed the assessment at A+ DUI Services, LLC. Respondent did provide documentation showing she completed the four classes for domestic violence survivors. Respondent completed a psychological evaluation in November 2023, and it was recommended that respondent complete mental health services, substance abuse services, and a parenting capacity assessment. She completed none of those recommended services. Respondent told Pease that "she just want[ed] to see her kids," but she was "not interested in doing any services." Respondent "flat out refused to do any mental health services."

¶ 11    Pease testified respondent complied with 6 out of 65 scheduled drug drops, testing positive each time she complied. All of respondent's drops tested positive for methamphetamine and amphetamines, and she tested positive for cocaine once. On more than one occasion, respondent suggested she tested positive because someone drugged her, but she never accused any specific person. In May 2023, respondent said she was "too fat" and "ha[d] her teeth," and therefore she did not do methamphetamine. Respondent told Pease the names of several medications she was taking, and Pease researched the medications and determined none of them would cause a false positive drug result for methamphetamine and amphetamines.

¶ 12    In June 2023, DCFS began requiring respondent to perform an oral toxicology

- 4 -

screen and test negative before visiting G.A. to ensure she was not under the influence of illicit substances during visits. After learning about this new requirement, respondent stopped visiting G.A., and she became less cooperative with DCFS. Respondent last visited G.A. in May 2023.

¶ 13 Respondent was asked twice to complete a hair follicle test, but she did not. Pease explained to her a hair follicle test would show if drugs were in her system, but respondent refused. Respondent offered to take a blood test, but DCFS did not offer that form of testing. On two separate occasions, respondent showed up to a visit and said she had tested negative at a company called Identi-Check. After the first instance, Pease called Identi-Check and learned the company does not supervise drug drops unless they are paid an additional fee. After the second instance, respondent said she had paid extra for supervision, but when Pease called Identi-Check to confirm respondent's account, the Identi-Check employee said she had not supervised respondent's drug drop. All drug drops performed through DCFS-approved organizations are supervised.

¶ 14 In December 2023, DCFS suspended respondent's visitation because a substantial amount of time had passed since she saw G.A. Respondent was "very adamant that she only wants to see her child but doesn't want to do any services because they're not needed."

¶ 15 Pease testified respondent was not cooperative throughout the life of the case. She never completed parenting classes. She never completed parent coaching. She repeatedly failed to appear at her scheduled drug drops. When she did appear, she tested positive for methamphetamine and amphetamines, and she did not take responsibility for her positive drug test results or her substance abuse issues. Respondent did not provide any proof of completion of substance abuse treatment. By the time of the hearing, it had been over a year since respondent last visited G.A. They did not talk on the phone, and respondent did not send G.A. a gift for his

birthday or on any other holiday. Pease testified respondent was not close to regaining custody of G.A. at any point during the case's pendency.

¶ 16 Janet Icenogle testified on respondent's behalf. Icenogle testified she had known respondent since approximately 2014, and respondent was the caretaker for Icenogle's brother, Jerry McDonald. She interacted with respondent "[m]aybe once a month or every other month." Icenogle testified she had never seen respondent appear to be intoxicated or behave erratically.

¶ 17 Jerry McDonald testified he was disabled, and respondent had been living with him and serving as his caretaker for "a couple years." He had known respondent for roughly 10 years. McDonald was aware of the allegations against respondent, but he did not believe they were true. During the time he spent with respondent, he had not seen her appear to be intoxicated or under the influence of any illicit substance. McDonald testified he was the one who sent respondent to Identi-Check, and he paid for her drug tests "[a]t least a dozen" times. After respondent tested at a DCFS-approved location, McDonald would pay to send respondent to Identi-Check immediately afterward, and occasionally he would randomly send her to be tested without warning. McDonald testified respondent never failed her Identi-Check drug drops. McDonald acknowledged he was not familiar with the different drug testing facilities' procedures. McDonald believed DCFS "doctored" respondent's positive drug tests because he thought "they want [G.A.] for some reason."

¶ 18 Respondent testified on her own behalf and denied using drugs of any kind, saying she was "too scared" to do so. Respondent had no explanation for why she would fail her DCFS-approved drug drops before passing the Identi-Check drug drops. Respondent testified she missed scheduled drug drops because she was not receiving the text message notifications informing her that she was scheduled for a drop. Respondent said DCFS frequently switched the

caseworkers assigned to G.A.'s case, and she was not notified in a timely fashion when there was a new caseworker she needed to contact. Respondent insisted she attempted to cooperate over the life of the case. Respondent acknowledged she received a court order to submit to a hair follicle test, which she did not do. Respondent believed the test would be inaccurate because she dyed and colored her hair. On cross-examination, respondent admitted she tested positive for methamphetamine when G.A. was born. She also acknowledged all the DCFS drug drops she took came back positive, and she did not complete parenting classes, mental health services, or substance abuse services. Respondent said she was still looking for a therapist, even though G.A.'s case had been open since 2022.

¶ 19    The trial court found the State proved by clear and convincing evidence respondent was an unfit parent. The court noted respondent tested positive for methamphetamine when G.A. was born. The court observed McDonald's testimony did not include how frequently he saw respondent or whether McDonald was familiar with the effect of illicit substances such that he could determine effectively whether respondent was using them. The court likewise found Icenogle's testimony unhelpful. The court concluded it was reasonable for DCFS to require respondent to complete drug drops and substance abuse services, and respondent consistently missed drug drops, tested positive for multiple substances on several occasions, and failed to complete any substance abuse services. Respondent refused to comply with a court order to complete a hair follicle test. Respondent failed to complete mental health services and parenting classes. Based on all of this, the court found respondent failed to maintain a reasonable degree of interest, concern, or responsibility for G.A.'s welfare. The court also found respondent failed to make reasonable efforts or reasonable progress toward G.A.'s return to her custody.

¶ 20    After the trial court found respondent unfit, the matter proceeded to a best-interest

hearing. The State recalled Pease, who testified G.A. had been with his current foster family for roughly a year and was "doing exceptionally well." G.A.'s foster parents met his medical, educational, emotional, and social needs, and they were willing to adopt him. G.A. was bonded to his foster parents, whom he referred to as "mama and dada," as well as his three foster siblings. G.A. was approximately two and a half years old, and respondent had not visited him in over a year. Pease had not observed respondent interact with G.A., so she did not know what, if any, bond respondent had with G.A. Respondent had never sent a card or gift to G.A., either directly to his foster family or to DCFS to pass along. Pease testified it was in G.A.'s best interest to remain with his foster family.

¶ 21 Icenogle testified she observed respondent interact with G.A. before G.A. came into DCFS's custody, and she described them as "happy" and "[b]onded very well." Icenogle testified respondent "took fantastic care" of G.A. and she observed "absolutely zero signs of neglect whatsoever." Icenogle thought respondent "was a perfectly wonderful mom."

¶ 22 McDonald testified he was familiar with respondent's efforts to care for G.A., saying "she did fantastic." G.A. had "a lot of medical needs," and McDonald testified respondent met those needs. McDonald was prepared to baby-proof his home if respondent regained custody of G.A. McDonald believed respondent would remain sober if G.A. was returned to her custody.

¶ 23 Respondent testified she bonded with G.A., and she believed G.A. still recognized her as his mother. Respondent believed it was in G.A.'s best interest not to terminate her parental rights because she cared for G.A.'s medical needs during his early months. She testified she had adequate income, and McDonald's house could be made suitable for G.A. quickly.

¶ 24 The trial court found it was in G.A.'s best interest to terminate respondent's parental rights. The court relied on the statutory best-interest factors, noting G.A. had lived with

his foster parents for more than a year, while he was in respondent's care for approximately four months. The court found G.A.'s senses of attachment, security, and identity were with his foster parents, who had met his needs for a substantial portion of his life. The court found G.A. was bonded with his foster family and noted his foster parents were willing to adopt him. The court emphasized respondent failed to complete the requisite services, despite having ample time to do so. The court found the State showed by a preponderance of the evidence it was in G.A.'s best interest to terminate respondent's parental rights.

¶ 25        This appeal followed.

¶ 26                                 II. ANALYSIS

¶ 27        On appeal, respondent argues (1) the trial court erred in finding her unfit, (2) the court erred by finding the termination of her parental rights was in G.A.'s best interest, (3) the court erred by relying on the results of DCFS's drug tests rather than her Identi-Check test results, (4) DCFS constructively denied her reunification efforts by not permitting her to utilize independent services, and (5) DCFS's decision to suspend her visitation privileges without a hearing constituted a due process violation. We disagree and affirm the court's judgment.

¶ 28                                 A. Good Cause

¶ 29        As a preliminary matter, we observe this is an accelerated appeal under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018), and we are required to issue a decision within 150 days after the filing of the notice of appeal unless good cause is shown. Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Respondent filed her notice of appeal on June 14, 2024, and our ruling was due to be filed by November 12, 2024. However, respondent's appellate counsel filed five different motions requesting extensions of time to file her initial brief, all of which we granted. Respondent's opening brief was not filed until April 7, 2025. Due to these delays, we

find good cause exists to issue our disposition after the 150-day deadline.

¶ 30       B. Compliance With Illinois Supreme Court Rules

¶ 31    We also choose to highlight respondent's appellate counsel's failure to comply with Illinois Supreme Court Rules. Rule 311(a)(7) requires an appellant to file their opening brief within 21 days after the record on appeal is filed in the appellate court. Ill. S. Ct. R. 311(a)(7) (eff. July 1, 2018). In this case, the appellate record was filed on July 11, 2024. Despite requesting and receiving numerous extensions of time to file respondent's opening brief, appellate counsel nevertheless did not file respondent's opening brief until April 7, 2025, which was more than two weeks after the extended deadline of March 31, 2025. As a result, appellate counsel had to file a motion requesting leave to file the brief *instanter*, which we granted. Additionally, appellate counsel failed to cite any caselaw whatsoever to support the opening brief's five-issue argument section. Indeed, save for a passing mention of the Adoption Act (750 ILCS 50/1 *et seq.* (West 2022)), appellate counsel's argument on respondent's behalf is devoid of references to legal authority of any kind. Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) asserts a brief's argument shall contain "citation of the authorities" upon which the party relies.

¶ 32    Illinois Supreme Court Rules "are not mere suggestions." (Internal quotation marks omitted.) *In re Denzel W.*, 237 Ill. 2d 285, 294 (2010). "[T]hey have the force of law and are to be construed in the same manner as statutes." *Denzel W.*, 237 Ill. 2d at 294. "A reviewing court is not simply a repository in which appellants may dump the burden of argument and research." (Internal quotation marks omitted.) *People v. Jackson*, 362 Ill. App. 3d 1196, 1199 (2006). "A reviewing court is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented." *Obert v. Saville*, 253 Ill. App. 3d 677, 682 (1993). Indeed,

"it is within our discretion to strike a brief and dismiss an appeal for failure to comply with the rules." *Freedman v. Muller*, 2015 IL App (1st) 141410, ¶ 22. However, "[s]triking a party's brief, in whole or in part, is a harsh sanction and is appropriate only when the violations hinder our review." *Gruby v. Department of Public Health*, 2015 IL App (2d) 140790, ¶ 12. Here, we choose to consider the issues respondent raises on appeal.

¶ 33                                    C. Standard of Review

¶ 34        The Juvenile Court Act and the Adoption Act govern how the State may terminate parental rights. *In re D.F.*, 201 Ill. 2d 476, 494 (2002). To terminate an individual's parental rights, the State must first show the parent is an "unfit person" and then show that terminating their parental rights serves the child's best interest. *D.F.*, 201 Ill. 2d at 494-95. Both showings must be made by clear and convincing evidence. *D.F.*, 201 Ill. 2d at 494. "A trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence." *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 48. Likewise, we will not reverse a court's best-interest finding unless it is against the manifest weight of the evidence. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009). "A trial court's decision is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." (Internal quotation marks omitted.) *In re N.B.*, 2019 IL App (2d) 180797, ¶ 30.

¶ 35                                    D. The Unfitness Finding

¶ 36        Respondent argues the trial court's unfitness finding was against the manifest weight of the evidence because she submitted multiple negative drug tests from Identi-Check, both Icenogle and McDonald testified they never saw her appear to be under the influence of illicit substances, and Icenogle said respondent provided for G.A. when he was in respondent's

care. The court found respondent was unfit because she failed to maintain a reasonable degree of interest, concern, or responsibility regarding G.A.'s welfare, and she failed to make reasonable efforts or reasonable progress toward G.A.'s return to her custody during the nine-month period from March 15, 2023, to December 15, 2023. When a parent is found unfit on multiple grounds, the reviewing court may affirm "based on evidence sufficient to support any one statutory ground." *In re Jordan V.*, 347 Ill. App. 3d 1057, 1067 (2004).

¶ 37        "[A] parent is not fit merely because she has demonstrated some interest or affection toward her child." *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004). Noncompliance with a service plan has been found to be sufficient evidence to warrant an unfitness finding. *Jaron Z.*, 348 Ill. App. 3d at 259. Respondent's service plans required her to, *inter alia*, engage in domestic violence counseling, engage in substance abuse treatment, complete parenting classes, obtain mental health treatment, and comply with random drug drops. Respondent fulfilled none of these requirements. Respondent took an initial assessment for domestic violence counseling, but she failed to pursue any further domestic violence services. Respondent completed an initial substance abuse assessment, but she did not complete any of the recommended services. Respondent complied with just 6 out of 65 scheduled DCFS drug drops. When she did comply with those drug drops, she repeatedly tested positive for methamphetamine and amphetamines, as well as cocaine and opiates. Respondent twice failed to complete parenting classes. She could not participate in parenting coaching until she received mental health treatment, but at the time of the fitness hearing, she claimed she was still looking for a therapist. Respondent did not take responsibility for her positive drug tests or her substance abuse issues, and she did not cooperate with DCFS throughout the life of the case. Based on the evidence presented, the trial court's finding that respondent failed to maintain a reasonable

degree of interest, concern, or responsibility regarding G.A.'s welfare was not against the manifest weight of the evidence, as the opposite conclusion is not clearly evident. See *N.B.*, 2019 IL App (2d) 180797, ¶ 30. We thus affirm the court's unfitness finding on those grounds and need not address the other bases for the court's unfitness finding. *In re C.W.*, 199 Ill. 2d 198, 210 (2002).

¶ 38                                    E. Best-Interest Finding

¶ 39          After a parent is found unfit, "the focus shifts to the child." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). "The issue is no longer whether parental rights *can* be terminated," but rather, "whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *D.T.*, 212 Ill. 2d at 364. The trial court must consider the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2022)). Those factors include: the child's physical safety and welfare; the development of the child's identity; the child's familial, cultural, and religious background and ties; the child's sense of attachments, including where the child feels loved, attached, and valued; the child's sense of security, familiarity, and continuity of affection; the child's wishes and long-term goals; the child's community ties; the child's need for permanence; and the uniqueness of every family and each child. 705 ILCS 405/1-3(4.05) (West 2022).

¶ 40          The evidence shows the best-interest factors, including G.A.'s physical safety and welfare, sense of attachment, senses of security, familiarity, and continuity of affection, and need for permanence, support the termination of respondent's parental rights. G.A. was bonded to his foster parents, and they met his medical, educational, emotional, and social needs. G.A. called his foster parents "mama and dada." G.A. was also bonded to his foster siblings. Conversely, respondent had not visited G.A. since May 2023, and she never sent G.A. a present or card on his

birthday or holidays. At the time of the best-interest hearing, G.A. was approximately two and a half years old, and he had not seen respondent for over a year. There appears to be no recognition by respondent, she has been absent for over 40% of G.A's life, and more importantly, that her absence was based entirely on a failure to obtain the required, supervised drug tests. G.A. had been living with his foster family for approximately a year, while he was in respondent's care for roughly four months. The trial court's best-interest decision was not against the manifest weight of the evidence, as the opposite conclusion was not clearly evident. See *N.B.*, 2019 IL App (2d) 180797, ¶ 30.

¶ 41                                    F. Respondent's Remaining Claims

¶ 42        Respondent summarily argues the trial court erred in relying on the results of her DCFS-approved drug test results rather than those from Identi-Check, she was denied a fair opportunity to complete services, and DCFS violated her due process rights by suspending her visitation privileges without a judicial hearing. Respondent cites no authority to support these underdeveloped claims, none of which warrant relief.

¶ 43        Respondent insists the trial court should have given more weight to her negative Identi-Check drug test results, essentially asking us to reweigh the evidence and reach a different conclusion. We decline this invitation. See *People v. Vega*, 2018 IL App (1st) 160619, ¶ 44 ("[W]e will not substitute our own judgment for the trier of fact on issues regarding the weight of the evidence or the credibility of witnesses."); *People v. Moore*, 2016 IL App (1st) 133814, ¶ 54 ("[I]t is not the function of the appellate court to retry the defendant."). Pease testified she called Identi-Check and learned Identi-Check did not supervise either of respondent's drug drops. Based on this, DCFS was not unreasonable when it did not accept respondent's Identi-Check's test results, as all drug drops performed at DCFS-approved locations are supervised. The court

did not err in not giving more weight to respondent's Identi-Check drug test results. See *In re Brown*, 86 Ill.2d 147, 152 (1981) ("[T]he trial court's opportunity to view and evaluate the parties and their testimony is superior to that of a reviewing court."). Notably, even if DCFS had accepted those results, the court's unfitness finding would have been the same because respondent failed to satisfy her service plan's requirements, as detailed above.

¶ 44　　　Respondent next contends she was not given a fair opportunity to complete the required services. The record begs to differ. The trial court found probable cause existed to believe G.A. was neglected in September 2022, and the fitness hearing began in May 2024. Over the course of 21 months, respondent received multiple service plans explicitly stating what she needed to do to regain custody of G.A. Respondent did not complete any of the requisite services. In fact, she told Pease she was "not interested in doing any services," and she believed services were not necessary. Respondent's assertion on appeal that she was denied a fair opportunity strains credulity when juxtaposed with her woefully insufficient efforts to reunite with G.A.

¶ 45　　　Finally, respondent argues, "The absence of due process in the suspension of visitation is a constitutional violation that infected the best interest analysis and contributed to an unjust outcome." However, respondent cites no legal authority, not even the United States or Illinois Constitutions, to support this claim. The record shows that, in June 2023, DCFS began requiring respondent to perform a clean drug drop before visiting G.A., a reasonable condition considering G.A. tested positive for methamphetamine when he was born and respondent had consistently tested positive for methamphetamine and amphetamines when she complied with her scheduled drug drops. Logic dictates this is perhaps the best and only objective method of assessing a parent's level of cooperation or investment in the return of their child. After this

requirement was put in place, respondent stopped visiting G.A. After six months of no visits, DCFS suspended respondent's visitation. This was an appropriate response to respondent's demonstrated lack of interest in completing the necessary steps to reunite with G.A. Accordingly, we find no error occurred during the proceedings below, and we determine the trial court's unfitness and best-interest findings were not against the manifest weight of the evidence. See *In re T.D.*, 268 Ill. App. 3d 239, 245 (1994); *Jaron Z.*, 348 Ill. App. 3d at 261-62.

¶ 46                                III. CONCLUSION

¶ 47          For the foregoing reasons, we affirm the trial court's judgment.

¶ 48          Affirmed.