2025 IL App (4th) 241211-U

NO. 4-24-1211

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

FILED
August 20, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* R.L., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | No. 21JA139 |
| v. | ) | |
| Anezka L., | ) | Honorable |
| Respondent-Appellant). | ) | Karen S. Tharp, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Zenoff and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held:*    The appellate court affirmed the trial court's termination of respondent's parental rights because the trial court's unfitness and best interest findings were not against the manifest weight of the evidence and the termination proceedings were not fundamentally unfair.

¶ 2    Respondent, Anezka L., is the mother of R.L. (born July 2020). In September 2024, the trial court found respondent was an unfit parent and termination of respondent's parental rights would be in the minor's best interest.

¶ 3    Respondent appeals, arguing (1) the trial court's unfitness and best interest findings were against the manifest weight of the evidence and (2) the termination proceedings were fundamentally unfair. We disagree and affirm.

¶ 4                                    I. BACKGROUND

¶ 5                                    A. Procedural History

¶ 6    In November 2021, the State filed a petition for adjudication of wardship, alleging

R.L. was neglected in that respondent (1) "failed to make a proper care plan for [R.L]," (2) "ha[d] substance abuse issues," and (3) maintained a home with "unsanitary conditions." See 705 ILCS 405/2-3(1)(a), (b) (West 2020). (We note that, prior to the filing of the petition, respondent had participated in an intact case with the Illinois Department of Children and Family Services (DCFS).)

¶ 7        Later that same month, the trial court conducted a shelter care hearing and placed temporary custody and guardianship of R.L. with the guardianship administrator of DCFS.

¶ 8        In July 2022, respondent entered a written stipulation to the allegation that R.L.'s environment was injurious to her welfare due to the unsanitary conditions of respondent's home, and the trial court adjudicated R.L. neglected on that basis.

¶ 9        In August 2022, the trial court conducted a dispositional hearing, at which it entered a written order finding respondent "unfit, unable or unwilling" for reasons other than financial circumstances alone to care for, protect, train, educate, supervise, or discipline R.L. The court also (1) adjudicated R.L. a ward of the court, (2) placed guardianship and custody of R.L. with the guardianship administrator of DCFS, and (3) admonished respondent that she "must cooperate with DCFS, comply with the terms of the service plan, and correct conditions that require [R.L.] to be in care, or risk termination of [her] parental rights."

¶ 10                        B. The Termination Hearing

¶ 11        In February 2024, the State filed a motion for termination of parental rights, alleging that respondent was an unfit parent because she (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to R.L.'s welfare (750 ILCS 50/1(D)(b) (West 2024)); (2) failed to make reasonable efforts to correct the conditions that were the basis for the removal of R.L. from her care within the nine-month period of July 2022 to April 2023 (*id.*

§ 1(D)(m)(i)); and (3) failed to make reasonable progress toward the return of R.L. to her care within the nine-month periods of July 2022 to April 2023 and April 2023 to January 2024 (*id.* § 1(D)(m)(ii)).

¶ 12                    1. *The Fitness Portion of the Termination Proceedings*

¶ 13            In September 2024, the trial court conducted the fitness portion of the termination proceedings. At the State's request, the court took judicial notice of all the orders previously entered in the case, including the adjudicatory and dispositional orders.

¶ 14                    a. Adriane Beck

¶ 15            Adriane Beck testified that from March 2022 to August 2023, she was employed at the Center for Youth and Family Services (CYFS) and served as R.L.'s caseworker. Prior to Beck's involvement, R.L. had another caseworker as part of an intact case.

¶ 16            Beck testified that R.L. came into care for "multiple reasons." She explained that R.L. was "developmentally delayed" and the house she lived in with respondent was unsanitary. Additionally, respondent (1) "tested positive for meth[amphetamine]," (2) "was aggressive with the DCFS staff," and (3) "had a history of *** assault with her mother with [R.L.] present." Beck also testified that respondent had a safety plan that she violated by bringing R.L. "somewhere *** she was not supposed to go" and respondent "only had one prenatal visit with R.L."

¶ 17            When Beck took over as caseworker in March 2022, the service plan that was in place required the following services: "housing, employment, cooperation, parenting, substance abuse, visitation, anger management, parenting classes, and a psychological [evaluation]," as well as mental health services and random drug tests.

¶ 18                    i. *Psychological Evaluation and Mental Health Services*

¶ 19            Beck testified that respondent acted "defensive" about having to attend mental

health services. Beck believed the services were necessary because she saw numerous horizontal scars on respondent's arms. Beck also described two incidents in May 2022 during which respondent exhibited unusual behavior. During one visit, respondent gave R.L. a haircut, but when the haircut did not turn out well, respondent "became extremely upset and was screaming and cursing and punching herself in the head." Around the same time, during a family and team meeting to discuss appropriate dress with respondent after she had accidentally exposed her breast to a male case aide, she "became very angry and started screaming, cursing at [Beck and her supervisor], and she was asked to leave at that point."

¶ 20        Beck stated that respondent completed a psychological evaluation, which resulted in the recommendation that she (1) see a psychiatrist for medication and medication management and (2) see a counselor weekly. Beck testified that respondent generally attended counseling, although she missed 5 out of 10 sessions due to her phone being off and oversleeping. By April 2023, the counselor reported to Beck that, despite missing half of her sessions, respondent was communicating well, in that she was not getting angry or exploding, but she was not engaging. Beck explained that "she still wasn't diving into anything to do with her mental health that was substantial."

¶ 21                    ii. *Substance Abuse Treatment and Drug Tests*

¶ 22        Beck testified that by May 2022, respondent was engaged in outpatient treatment services at Gateway Foundation (Gateway) and she completed those services around September 2022. However, between March 2022 and August 2022, respondent did not attend any of the drug tests requested by the agency. Overall, between March 2022 and August 2023, although the agency requested four drug tests per month, respondent attended only four or five in total. Respondent told Beck that her work schedule was getting in the way of her attending the drug

- 4 -

tests, but when Beck asked for respondent to provide her work schedule so Beck could accommodate her, respondent never did so.

¶ 23    Beck testified that in June 2022, respondent tested positive for alcohol while she was in the Gateway program and tested positive for marijuana on "more than one occasion."

¶ 24    Beck also testified that respondent told her she was using marijuana daily to treat her anxiety. Beck stated, although respondent's marijuana use was not illegal, it prevented Beck from getting an accurate picture of respondent's mental health. Additionally, respondent was using marijuana while pregnant.

¶ 25    On cross-examination by the guardian *ad litem* (GAL), Beck testified that in June 2023, respondent told her she had been drinking alcohol and was no longer pregnant.

¶ 26                    iii. *Parenting Classes*

¶ 27    Beck testified that respondent completed parenting classes around May 2022. However, because she was "struggling" with staying in contact and the service provider believed she was overwhelmed with services, the provider recommended that she also complete parenting coaching in the future, when R.L. was closer to being returned home.

¶ 28                    iv. *Anger Management Classes*

¶ 29    Respondent completed anger management classes in January 2023. However, by August 2023, Beck still had concerns about respondent's ability to manage her anger. Beck explained that, around April 2023, when issues started arising over the home safety checks, "that's when it started to get bad again and we started having a lot of trouble being able to communicate because of aggression."

¶ 30                    v. *Visits, Housing, Employment, and Cooperation*

¶ 31    Between March 2022 and August 2022, respondent was given one visit per week

and had been approved for home visits. However, after "a month or two," respondent reported a roach infestation in her home, so visits occurred at the office until a safety check could occur. Respondent generally attended the visits at the office, although she did have issues arriving on time. Also, case aides reported issues with respondent not being prepared with food and diapers and "hitting her vape in a few different visits." Beck conducted at least four home safety checks but was never able to deem respondent's home safe and appropriate, so visits with R.L. at home never resumed.

¶ 32      In April 2023, at one of those safety checks, when Beck arrived at respondent's home, respondent answered the door in her robe and said she forgot that they were coming over. She said her "lights had been shut off for failure to pay the bill." Beck could see that the house was "still very cluttered" and there was a "very, very strong smell of marijuana." There was also a man in the bed that respondent did not introduce to Beck. Beck later learned that the man in the bed was "Malcolm" and that respondent was pregnant. Respondent had not reported Malcolm as a paramour.

¶ 33      Regarding communication, Beck testified that between March 2022 and August 2023, she spoke with respondent every other week and met with respondent every other month, if not more. Beck stated that she met with respondent more than other parents because she was "trying to get her to engage and help her understand why she needed to engage so that she could be successful and [R.L.] could be returned home to her."

¶ 34      Beck also testified that, in June 2022 and July 2022, respondent was "mak[ing] some progress in cooperating with the agency" and, at the time of Beck's August 2022 disposition hearing report, she believed respondent had made some progress toward reunification with R.L. In her opinion, from August 2022 to January 2023, respondent was "making great

progress in the cooperation realm," noting that "[s]he was awesome to work with." Beck had increased respondent's weekly visits to three hours because she was "compliant *** and pleasant" and "was doing well with her daughter."

¶ 35 Nonetheless, in April 2023, Beck started "having issues with cooperation *** and *** her anger again," explaining that things started to go downhill after the April 2023 home safety check when Malcolm was present. Immediately after that incident, respondent would become angry when Beck and respondent talked on the phone, she began cursing again, and the communication became less frequent. Beck stated this behavior persisted for the rest of her time as caseworker. She also explained that respondent's cluttered house prevented her from allowing home visits because a child of R.L.'s age, who had just begun walking, could grab things and put them in her mouth. Beck did not believe respondent "ma[d]e progress on her treatment goals."

¶ 36 On cross-examination by the GAL, Beck testified that although respondent's visitation time increased to three hours per week, Beck never advanced the visits to unsupervised status. Beck also testified that while she was the caseworker, she never reached a point that she would have recommended to return custody of R.L. to respondent.

¶ 37                                  b. Officer Trevor Davis

¶ 38 The State called Officer Trevor Davis of the Springfield Police Department, who testified about an incident in November 2023 when he was dispatched to respondent's home. Respondent was on the front porch, and Malcolm was inside. Respondent identified Malcolm as her ex-boyfriend, stating that they had been dating for two years and were now broken up, but she allowed him to still stay at her home. Davis stated that respondent had called the police and reported that Malcolm was threatening her with an axe, so she threw a broom at him. When Davis spoke with respondent, she was "very loud, she was yelling at us like she was mad at us."

He said it was hard to collect information from her. He did not believe she was under the influence of alcohol but thought "maybe she was having some kind of a mental health episode or maybe she was on something."

¶ 39       When respondent overheard Malcolm telling the police that respondent had kicked him in the face, she then told Davis that Malcolm had hit her seven or eight times. Davis tried to ask her about the axe, but "she refused to speak."

¶ 40       Davis testified that he and another officer attempted to place them both under arrest, but respondent would not get in the squad car and kicked another officer in the stomach. Davis testified that he arrested respondent for domestic battery, resisting arrest, and aggravated battery, but he was unaware if the State formally charged her in court.

¶ 41                          c. Hayley McAfee

¶ 42       Hayley McAfee testified that she was employed at CYFS and was respondent's caseworker from September 2023 to present. When McAfee took over as caseworker, respondent's service plan required "substance abuse, anger management, psychological, [and] mental health [services], visitation, cooperation, toxicology screens" and a "parenting capacity assessment to be determined if she were to ever engage," which "DCFS at the time was not approving *** due to her lack of engagement." Respondent was also required to maintain stable housing and employment.

¶ 43       McAfee testified that, as part of respondent's service plan, respondent was required to provide verification of any progress in services to McAfee. However, respondent never provided McAfee any reports of progress in counseling, substance abuse, or psychiatric treatment.

¶ 44                          i. *Mental Health Services*

¶ 45        McAfee testified that when she took over the case in September 2023, she received reports that respondent's engagement in counseling was decreasing. Respondent would attend only virtual sessions and would often be late or cancel the sessions. When she did attend, she questioned why she needed to be there and would not "establish any goals with her counselor or dig into *** any of her trauma or past history."

¶ 46        McAfee also testified that in November 2023, she conducted a family and team meeting over the phone, during which she spoke to respondent about her mental health services. McAfee testified that respondent became upset about being asked to do mental health services because she did not believe she needed counseling or medication. Respondent told McAfee that a doctor had prescribed her medication but she would not be filling the prescription because she did not believe the diagnosis was accurate. The meeting ended early because respondent angrily hung up the phone.

¶ 47        Respondent's counselor left in November 2023, and McAfee offered respondent another counselor with the same agency; however, respondent declined and said she would find her own. In February 2024, respondent reported that she was on a waiting list for a new counselor. After a few months of no progress, around May 2024, McAfee referred respondent back to CYFS for a counselor, and respondent was placed with a new counselor in June 2024.

¶ 48        Between September 2023 and February 2024, respondent did not provide any verification that she was engaging in psychiatric services or taking her prescribed medication.

¶ 49                    ii. *Substance Abuse Treatment and Drug Tests*

¶ 50        McAfee testified that in November 2023, respondent had still not provided a work schedule, which was a "topic of contention" because McAfee needed to know what days respondent could attend drug tests or whether the days she missed qualified as excused absences.

¶ 51    Between September 2023 and January 2024, McAfee requested 20 weekly random drug tests, but respondent attended only 6. Of those six, "[t]wo or three [were] adulterated" and two were positive for alcohol. McAfee testified that respondent's alcohol use was "definitely not safe for her unborn child, and coupled with her mental health diagnosis and lack of treatment, lack of engagement in counseling, the alcohol seemed like a poor coping mechanism."

¶ 52    However, McAfee also testified that respondent reengaged in Gateway's outpatient treatment program in January 2024 and graduated in August 2024.

¶ 53                        iii. *Anger Management*

¶ 54    In November 2023, although respondent had previously completed an anger management program, McAfee referred her to be "assessed for domestic violence and anger management" services due to the November 2023 arrest. As a result of the assessment, respondent was asked to complete another 26 anger management sessions. In July or August 2024, when McAfee found out respondent was dating Malcolm again, she reported the relationship to the service provider. The provider advised that respondent had been denying the relationship. Accordingly, due to respondent's "not being honest and forthcoming," the service provider increased her session requirement to 40. As of August 2024, respondent had not completed anger management sessions but was "making progress."

¶ 55                        iv. *Visits, Housing, and Cooperation*

¶ 56    McAfee conducted a home safety check in June 2024. Although she "had some concerns," she said "it would "likely be deemed safe." McAfee became concerned a male was living in the house because she observed a lot of "workout powders" on top of the refrigerator, but respondent told McAfee that she was taking the powders to gain weight.

¶ 57      The following day, McAfee asked respondent about her relationship status and "we ended up discovering that she was pregnant this summer [(2024)]." McAfee asked for several weeks who the father was, and respondent finally disclosed that the father was Malcolm and that they would be in a relationship going forward. This information concerned McAfee because the pair had been arrested for domestic violence in November 2023. Moreover, respondent had claimed they were not in a relationship, but "it appears that maybe they have been in one this entire time and she wasn't disclosing it." McAfee added that Malcolm would be required to complete services due to the incident with the police. McAfee also testified that respondent did not tell her about the arrest; instead, McAfee learned about it in the news.

¶ 58      McAfee also testified that Malcolm had not yet engaged in any domestic violence or anger management courses, although McAfee had "laid out the things he can get started on himself before his unborn child is born."

¶ 59      McAfee testified about visitation between September 2023 and the present. She stated that weekly visits occurred between September 2023 and early March 2024 and, since March 2024, the visits had become biweekly. Prior to the visits becoming biweekly, respondent had attended only 6 out of 20 visits and arrived late for some of the visits that she did attend.

¶ 60                              v. *Parenting Capacity Exam*

¶ 61      On cross-examination by respondent, McAfee testified that she had requested a parenting capacity exam, which DCFS denied due to respondent's lack of progress. However, McAfee had "since requested that [again] since she's made more progress," and her request was approved and scheduled for March 2025. She requested the parenting capacity evaluation because R.L. "has special needs." The exam would "go into whether or not [respondent] can meet *** [R.L.'s] safety needs [or] her emotional needs, keep up with what she's going to need

through school, her doctors' appointments, and things like that."

¶ 62 Respondent's counsel asked McAfee what progress respondent was now making that led to DCFS approving the exam. McAfee answered that respondent was now more cooperative, had completed her drug program, and was attending drug tests and staying sober "for the last couple months it appears." McAfee also testified that respondent was engaged in counseling but emphasized that respondent caused a delay by choosing to seek her own counselor and then not doing so for three months before being waitlisted. McAfee further stated that respondent's lack of honesty about Malcolm "waste[d] eight months getting him engaged in the case." Also, although she was attending her additional anger management sessions, she would not graduate for another four and a half months.

¶ 63 McAfee also expressed concern about R.L.'s safety or what she might witness in respondent's care if an incident like the one in November 2023 with Malcolm were to occur.

¶ 64                                    d. Respondent

¶ 65 Respondent testified that to address her substance abuse issues she obtained a new job, was "trying to complete [her] services," and was "doing [her] coping skills." She graduated from the Gateway program and enjoyed it.

¶ 66 She also testified that she tried her best during her mental health sessions but did not feel that she connected with her first counselor. When that counselor left, respondent opted to find her own counselor because she did not believe she would connect with any counselor at that agency. She approached Memorial Behavioral Healthcare, but they "stopped the whole session" when they found out she was involved with DCFS. Respondent then went to Survivor Recovery, where she was waitlisted. Eventually, she went back to CYFS, where she began counseling with a new counselor. Although she had been seeing her for only a couple months, respondent felt that

things were going better.

¶ 67    Respondent also testified that she had maintained employment throughout the case, first at Dairy Queen, then at McAllister's Deli, and currently at Delta Vapes. She stated that she sent her work schedule to her first caseworker, Beck, but was not sure if she sent McAfee any of her schedules, although she had "recently" been sending McAfee her schedule at Delta Vapes. She also testified that she had lived in the same apartment throughout the case, which she described as a "pretty small" studio apartment. She had been organizing it lately and made R.L. her own room.

¶ 68    Respondent also testified about the November 2023 incident with Malcolm. She said they had both been drinking that night. When asked what steps she was taking to make sure that no similar incident would happen again, respondent said that she was taking domestic violence classes "right now" and having conversations with Malcolm about "how we really need to get it together." Counsel asked if respondent "work[ed] on those type of issues in counseling," and respondent said, "No, because honestly ever since that incident happened, we haven't really had any problems."

¶ 69    Respondent testified that Malcolm was willing to do any services needed for respondent to get R.L. back. She was willing to continue with her drug screens and parenting classes. She said she was a completely different person than she was three years ago, and she just wanted "another chance to bring [her] daughter home."

¶ 70    On cross-examination by the State, respondent testified that she did not tell the agency about her relationship with Malcolm earlier because she felt like "they're just going to be mean to me or something or start unnecessary drama." She said, "[T]he only reason they're nice to me now is because I have an advocate."

¶ 71 Respondent testified that she did not believe Malcolm posed a risk to her sobriety because "he is also sober now." She also did not feel that he posed a risk to her reunification with R.L. because "[a]s long as he does his services, I feel like everything should be fine."

¶ 72 Respondent also testified that she last drank in "January of this year or February" and Malcolm last drank four months ago. When asked whether she sometimes used cannabis or marijuana, respondent answered, "Yes," and testified that she last used marijuana "[p]robably a couple days ago." When asked when Malcolm last used marijuana, respondent answered, "Probably a couple days ago with me."

¶ 73 On cross-examination by the GAL, respondent testified that she graduated from the Gateway program in September 2023, then the incident with Malcolm occurred in November 2023. She was not currently attending any substance abuse treatment.

¶ 74                                    e. Erica Volentine

¶ 75 Erica Volentine testified that she became respondent's advocate at Primed for Life in January 2024. She testified that, since she was involved with respondent, respondent had made "excellent progress" in her services. Volentine had visited respondent in her home "four or five times" and believed it was appropriate for R.L. Volentine believed respondent had control of her anger issues, was aware of R.L.'s special needs, and was able to parent her appropriately.

¶ 76 On cross-examination by the State, Volentine testified that respondent mentioned Malcolm at their first meeting in January 2024, but they did not discuss him "in depth" until later, in July 2024, when respondent told Volentine that she was pregnant. When discussing the pregnancy and respondent's relationship with Malcolm, they discussed services DCFS might request him to complete. He appeared willing to cooperate. Volentine did not have any concerns about Malcolm posing a risk to respondent's sobriety. Volentine testified that she was "not sure"

what services he had accomplished since then. Volentine had given him information about a parenting class, substance abuse treatment, and mental health treatment, but she did not know if he had voluntarily undertaken any of those services.

¶ 77                                  f. The Trial Court's Ruling

¶ 78        The trial court first noted that much of the evidence presented at the fitness hearing related not to respondent's fitness but instead to R.L.'s best interest; the court stated that it was not considering any of the evidence that was unrelated to the fitness allegations.

¶ 79        The trial court began its ruling by noting that respondent had engaged in services, completing many, and that she had engaged in visits, although "there were still some issues," such as visits having to be moved out of the home and respondent arriving late. The court then observed, "But this case is more than about just checking off boxes. Was there benefit from those services?" The court pointed out that although respondent had completed anger management classes, afterward, in November 2023, she had a physical altercation with Malcolm, during which, despite "having gone through anger management [and] being in counseling, her reaction *** was to kick the officer." The court noted that although she "checked off some boxes," she had not made progress by then.

¶ 80        The trial court then addressed the April 2023 home safety check, noting that "the case was actually adjudicated for basically the minor's environment [being] injurious to her welfare as evidenced by the unsanitary conditions in the home," yet "nine months after adjudication," at the home safety check, "[b]ills hadn't been paid, so there was no electricity. She had a man on her bed she had never told DCFS about. She said at that time she was pregnant. The home was very cluttered. There was a strong smell of marijuana." The court noted that, even by August 2023, according to the caseworker, the home was "still not safe or appropriate for

- 15 -

visits," let alone for R.L. to live in.

¶ 81    The trial court also noted that, by April 2023—the end of the first nine-month period—respondent was not engaging in her counseling sessions and had missed half of them. Also, although the caseworker stated in January 2023 that things were improving, by April 2023, respondent began showing signs of aggression again.

¶ 82    The trial court observed that by November 2023, respondent was "still not acknowledging that she needed mental health treatment." Indeed, respondent "didn't believe she had a mental health diagnosis, she didn't want medication, she didn't believe that she needed treatment." A doctor prescribed her medication, but respondent did not fill the prescription. The court found, "So clearly by November [2023, respondent] was still not at that point where she was ready to *** make progress." The court questioned whether that was due to respondent still using alcohol and cannabis but found that "despite having gone through certain services, being engaged in services, by November [2023], she still wasn't there, she still wasn't acknowledging what went on and what she needed to do for her sake as well as for her child."

¶ 83    The trial court had "great concern" that after the November 2023 incident with Malcolm, respondent was assessed for anger management and domestic violence, stating, "[G]osh darn it, she lied to them. She never told them she was in a relationship with Malcolm *** despite that being an issue." The court stated, "That's a huge concern for me. She didn't tell Gateway, she didn't tell the caseworker. She finds out in March [2024] that she's pregnant, so obviously she's been engaging with Malcolm prior to that." The court continued, "[S]he wasn't open, she wasn't honest. And that's a huge red flag for me. Considering how serious that incident in November was, *** she didn't tell Gateway because she didn't want the drama, she didn't tell the caseworker because she didn't want the drama." The court noted that respondent's

- 16 -

lack of honesty was a "huge issue" because "[e]ven the Primed for Life advocate said it would probably make a difference if they'd have known in March that she was pregnant by Malcolm."

¶ 84      The trial court noted that in January 2024—the end of the second nine-month period—"there's still issues with her being on time for visits, missing visits, a significant number of visits."

¶ 85      The trial court observed that the law gives a parent nine months to make reasonable efforts and reasonable progress and, in this case, respondent's progress came *after* two nine-month periods had already elapsed. The court then found as follows:

> "I find by clear and convincing evidence that [respondent] failed to demonstrate a reasonable degree of certainly responsibility as to the minor's welfare, and largely that is because of not fully engaging, not being open, not engaging with her services to show that it was making a difference. So again, clearly she did not make reasonable efforts to correct conditions. The home was still unable to have visits in. She still did not make reasonable progress towards having the child returned to her during both of the nine-month time periods.
>
> At no point in time up through January of '24 was I able to say I was close to being able to return this child to [respondent's] care, and that is the objective standard that I am to use. So for those reasons, I do find that [respondent] is an unfit parent based upon the allegations in the petition."

¶ 86      2. *The Best Interest Portion of the Termination Proceedings*

¶ 87      That same day, after the conclusion of the fitness portion of the termination proceedings, the trial court conducted the best interest portion of the termination proceedings. At the State's request, the court took judicial notice of the testimony presented during the fitness

portion of the termination proceedings.

¶ 88                                    a. McAfee

¶ 89          The State again called McAfee, who testified that she visited R.L. in her foster home "[a]t least monthly." R.L. had been living in her current foster home since coming into care in November 2021, when she was 16 months old. She had a foster sister in the home who began living there at two days old and who was now two years old. McAfee said R.L.'s relationship with her foster sister was "very close."

¶ 90          McAfee testified that when R.L. came into care, she was unable to walk or communicate. McAfee stated, "She was food-hoarding, head-banging, and just, she seemed very delayed compared to an average 16-month-old." Now, at four years old, R.L. had "made a lot of improvements ***, but she still does have some developmental delays compared to her peers." R.L.'s foster parents took her to monthly occupational therapy and speech therapy sessions and pediatrician appointments.

¶ 91          McAfee testified that R.L. was doing "[g]reat" in her foster home. She stated, "[R.L.] is consistently improving, gaining skills, filling the gap on her developmental delay, and just like learning the skills and things that we weren't ever really sure she would be capable of, so she just keeps excelling [beyond] everyone's expectations." McAfee stated that R.L.'s foster parents were taking care of all of her emotional, mental, and educational needs. She described the bond between R.L. and her foster parents as "very strong and secure," adding that she "looks to them in *** her moments of chaos for some peace." R.L. called her foster parents "[m]om and dad," and her foster parents wished to adopt her.

¶ 92          McAfee also testified that respondent had never participated in any of R.L.'s therapy or medical appointments. When R.L. came into care, she had missed six well-child

- 18 -

appointments, which was concerning to McAfee because R.L.'s developmental delays were not being brought to the attention of a doctor who could provide interventions. McAfee expressed concern about respondent's ability to take R.L. to her therapy and medical appointments, specifically noting respondent's difficulty with "[p]lanning and time management." McAfee elaborated that respondent "continues to be late to visitation [and] sleep through her appointments," and she pointed out that respondent was late to court that day.

¶ 93    McAfee believed it was in R.L.'s best interest that respondent's parental rights be terminated so R.L. could have permanency. McAfee explained that R.L. was getting old enough that "she's seeing these other kids with *** normal lives, and she deserves to not have these question marks for another unknown amount of time." McAfee added, "[Respondent's] been given plenty of opportunity to resolve these *** problems, and [R.L.] just needs to be able to move on in her life with whichever direction this goes."

¶ 94    On cross-examination by respondent's counsel, McAfee testified that R.L. also had a bond with respondent, which she described as a "big-sister bond." She explained, "[I]t's always fun and good, it's for a couple hours at a time, they're always doing something fun and exciting." She added, "[R.L.] knows that's her other mom, but at the end of the day, it's her foster parents taking her to her doctors' appointments and showing up to school for her and helping her when she's sick and things like that." McAfee testified that R.L. called respondent "mom" and says that she loves her. McAfee stated that the foster parents were open to maintaining a relationship between respondent and R.L.

¶ 95                                     b. Jessica W.

¶ 96    Jessica W. testified that she had been R.L.'s foster parent for the last two and a half years. Jessica's husband was "the best of friends" with R.L., and they shared a strong bond.

She stated, "[W]hen [R.L.] sees him, she gets excited," and "if we are all going on an outing, she wants to make sure that my husband is going along with us just so we can all experience it together as a family." When R.L. came into her care, R.L. "wasn't babbling or anything" and "was not walking or moving a whole ton." R.L. was initially not engaging socially at all with Jessica or her husband. They worked with R.L. to get her to "realize that she had legs" by doing things like putting her in a bouncer. Within about a month, R.L. was crawling.

¶ 97 Jessica testified that initially, R.L. had some behavioral issues, such as head banging, scratching, and pocketing food in her mouth. She also had some initial difficulty with navigating the classroom and being around peers in the pre-K program she was enrolled in. However, she no longer demonstrated those behaviors and overcame her issues in pre-K. Jessica said that R.L. was now running around with her friends at the park and described her speech as "incredible," noting, "She's able to tell us how she's feeling now," and "she's just an overall healthy little girl."

¶ 98 Jessica testified about R.L.'s relationship with her foster sister, describing them as "like typical sisters" who "love to play." Jessica also testified that she has extended family in the area with whom R.L. had developed relationships, including Jessica's nieces and nephews. Jessica said R.L. called Jessica's parents "Gigi and Papa." R.L. liked to go to their home, where she swings, rides in a golf cart, reads books, and watches movies with her foster grandparents.

¶ 99 On cross-examination by respondent's attorney, Jessica testified that R.L. appeared to enjoy the time she spent with respondent. She said that R.L. only recently began talking about respondent, calling her "new mommy."

¶ 100                                        c. Volentine

¶ 101 Volentine testified that she had observed one three-hour visit and "a partial other

visit." She said respondent was prepared with a craft project, brought a meal, checked R.L.'s diaper, and was "communicative and age-appropriate." Volentine testified that there was a bond between respondent and R.L. that she described as "affectionate" and "very close." She said R.L. did not become upset at the end of the visits because respondent "prepares her" for the visit to end. She believed that R.L. would be harmed by having no contact with respondent.

¶ 102                                    d. Respondent

¶ 103          Respondent testified that R.L. "was always talking since she was about six or five months old" and she stopped talking only after she was taken into DCFS custody. She also said that she had videos of R.L. trying to walk before she was taken into custody but stated, "I just feel like she didn't want to walk in front of me."

¶ 104          Respondent testified that she had a "great bond" with R.L., adding, "We've always been the best of friends" and that R.L. called her "mom." She believed that R.L. would be "affected mentally if [respondent was] not in her life," stating that R.L.'s being taken away from her "did developmentally delay her and affect her already."

¶ 105          Respondent believed she could provide for all of R.L.'s needs and that she would "drop whatever [she] was doing" if R.L. needed her. She believed she could take care of R.L.'s educational and medical needs and also provide emotional support and protection.

¶ 106          On cross-examination, the GAL asked respondent why she missed six well-child visits before R.L. was taken from her. She answered, "I'm going to be honest. That was just me not wanting to go to the doctor. Now I know that I should have been taking her to the doctor, absolutely. I've learned from that."

¶ 107                                 e. The Trial Court's Ruling

¶ 108          The trial court found that it was in R.L.'s best interest to terminate respondent's

parental rights. The court noted that R.L. had been in her current foster home "for most of her life" and had bonded with her foster parents and sister. The court acknowledged that R.L. enjoyed her visits with respondent but noted that R.L. also needed structure, which the court did not believe respondent could provide. The court stated that it did not know when respondent might be able to provide that structure and that it did not want to leave R.L. in limbo.

¶ 109    The trial court stated the following:

"So when I look at all of the [statutory best interest] factors, where she feels secure, where she goes for help on a day-to-day basis, who gets her up in the morning, who feeds her, who clothes her, who gets her to school, who gets her to her doctors' appointments, that's been the foster parents for most of her life now.
***

    ***

So I do find considering all the factors we've gone through that the State has shown by a preponderance of the evidence that it is in the best interest of the minor that [respondent's] parental rights be terminated. I agree with [the GAL]; she needs permanence, she needs to no longer be in limbo."

¶ 110    This appeal followed.

¶ 111                                II. ANALYSIS

¶ 112    Respondent appeals, arguing (1) the trial court's unfitness and best interest findings were against the manifest weight of the evidence and (2) the termination proceedings were fundamentally unfair. We disagree and affirm.

¶ 113                        A. Accelerated Appeal Filing Deadline

¶ 114    Initially, we note that this is an accelerated appeal under Illinois Supreme Court

Rule 311(a) (eff. July 1, 2018). Under that rule, this court is required to issue its decision in an accelerated case within 150 days after the filing of the notice of appeal unless there has been "good cause shown." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018).

¶ 115    Here, respondent's notice of appeal was filed on September 13, 2024, and this court's disposition was due to be filed by February 10, 2025. That filing deadline has passed. However, we note that respondent filed three motions for an extension of time to file her brief, on November 8, 2024, January 13, 2025, and April 14, 2025. This court granted each of respondent's requests for extensions of the deadline to file her brief.

¶ 116    We also note that, shortly after the completion of the briefing in this case in late May 2025, this court became aware that appellant's attorney, William T. Panichi, had potentially violated Illinois Supreme Court rules and Illinois Rules of Professional Conduct in other pending appeals. Subsequently, on July 21, 2025, this court issued its decision in, *In re Baby Boy*, 2025 IL App (4th) 241427, ¶¶ 110, 112, sanctioning attorney Panichi for violating Illinois Supreme Court Rule 341(h)(7) (eff. October 1, 2020), by "citing cases that do not exist for principles of law that do not exist," which constituted a violation of Illinois Rules of Professional Conduct of 2010 3.1, 3.3 (eff. Jan. 1, 2010) and 8.4 (c) (eff. July 1, 2024) by "making false statements and misrepresentations of the applicable law to this court." This court also concluded that attorney Panichi violated Illinois Supreme Court Rule 375(b) (eff. Feb. 1, 1994) by "citing fictitious cases for propositions that were not supported by existing law." *Baby Boy*, 2025 IL App (4th) 241427, ¶ 118.

¶ 117    Additionally, on August 7, 2025, this court filed its decision in *In re S.M.*, 2025 IL App (4th) 250277-U, ¶ 32, again sanctioning Panichi for "willfully citing multiple cases that do not exist or do not stand for the propositions of law for which they were cited." See *In re A.S.*,

2025 IL App (4th) 250298-U, ¶¶ 18-20 (issued August 4, 2025, and imposing sanctions upon Panichi for citing cases that do not exist). In *S.M.*, *S.S.*, and *Baby Boy*, sanctions were imposed following rule to show cause proceedings, and in each case, Panichi has been referred to the Attorney Registration and Disciplinary Commission (ARDC). Since *Baby Boy* was issued, Panichi has stated that he is "working on closing out [his] practice appropriately and surrendering [his] license." *Springfield Attorney Fined for Using AI, Citing 'Nonexistent' Cases* (Aug. 1, 2025) https://www.wcia.com/news/sangamon-county/springfield-attorney-fined-for-using-ai-citing-nonexistent-cases.

¶ 118          Addressing Panichi's misconduct, which also occurred in the present case (as we discuss *infra* ¶¶ 139, 152), required a uniform response by this court and caused further delay in the issuance of our decision. We note that, although Panichi has cited nonexistent cases and cases that do not stand for the propositions of law asserted, because Panichi has already been referred to the ARDC and is surrendering his license, we have elected to not pursue sanctions in the present case, which would require further rule to show cause proceedings and cause further delay.

¶ 119          Given respondent's motions for extensions of time and misconduct, we conclude that there is good cause for issuing our disposition after the 150-day deadline.

¶ 120                              B. Appellant's Brief

¶ 121          We must also address the sufficiency of appellant's brief. The State argues that respondent has forfeited each of her arguments because her brief fails to comply with Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020), which requires an appellant's brief to include "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citations of the authorities and the pages of the record on appeal relied on." We agree with the

State that respondent's brief is deficient in that it fails to reference the pages of the record relied upon and presents claims that are not supported by developed argument and citation to relevant authority.

¶ 122    Although this court would be well within its authority to not only consider respondent's claims forfeited, we also retain the discretion to strike respondent's brief and dismiss her appeal. *Freedman v. Muller*, 2015 IL App (1st) 141410, ¶ 22. However, because we are able to discern respondent's arguments on appeal and the record is sufficient for us to determine the issues on appeal, in the interest of obtaining permanency for R.L., we elect instead to address the appeal on its merits.

¶ 123                    C. The Trial Court's Fitness Determination

¶ 124    It is well settled that "[b]ecause each of the statutory grounds of unfitness is independent, the trial court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds." *In re Adoption of P.J.H.*, 2019 IL App (5th) 190089, ¶ 11. Based on our review of the record, we conclude that the court's finding that respondent failed to make reasonable progress within either of the nine-month periods alleged in the petition (July 2022 to April 2023 and April 2023 to January 2024) was supported by the evidence. Accordingly, we discuss only that finding.

¶ 125                    1. *The Applicable Law and the Standard of Review*

¶ 126    The State must prove unfitness as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)) by clear and convincing evidence. *In re N.G.*, 2018 IL 121939, ¶ 28. Section 1(D)(m)(ii) of the Adoption Act defines an unfit person as a parent who fails to make "reasonable progress toward the return of the child" during any nine-month period following an adjudication of neglect or abuse. 750 ILCS 50/1(D)(m)(ii) (West 2024). Reasonable

progress is an objective view of the steps the parent has taken toward the goal of reunification and examines the demonstrability and quality of those steps. *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 51. Additionally, the Illinois Supreme Court has held that "the benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans." *In re C.N.*, 196 Ill. 2d 181, 216 (2001). Reasonable progress exists when the trial court can conclude that, in the near future, it will be able to order the children returned to parental custody. *Ta. T.*, 2021 IL App (4th) 200658, ¶ 51.

¶ 127          A determination of parental unfitness involves factual findings and credibility determinations that the trial court is in the best position to make. *In re M.I.*, 2016 IL 120232, ¶ 21. Accordingly, a trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence. *N.G.*, 2018 IL 121939, ¶ 29. A decision is against the manifest weight of the evidence when the opposite conclusion is clearly apparent. *Id.*

¶ 128                                    2. *This Case*

¶ 129          The evidence in this case supports the trial court's finding that respondent was unfit because she failed to make progress toward the return of R.L. during either of the nine-month periods alleged in the petition.

¶ 130          Beck was the caseworker from March 2022 to August 2023, which covered the entirety of the first nine-month period (July 2022 to April 2023) and half of the second nine-month period (April 2023 to January 2024), while McAfee was the caseworker for the second half of the second nine-month period and thereafter. Respondent's service plan required participation in mental health services, substance abuse treatment and random drug testing, parenting classes, anger management classes, visitation, cooperation, and maintenance of

housing and employment.

¶ 131 Respondent completed a psychological evaluation, but she never completed mental health counseling or complied with psychiatric treatment. She completed outpatient substance abuse services at Gateway but continued using alcohol and marijuana. She also failed to attend the vast majority of her random drug tests. Although she later reengaged at Gateway in January 2024 and graduated in August 2024, that occurred well after the end of the second nine-month period. At that point, R.L. had been in foster care for nearly three years.

¶ 132 Respondent completed parenting classes, but the service provider reported that she struggled with maintaining contact with the parenting coach and recommended further parenting coaching when R.L. was closer to being returned home, which never occurred due to respondent's lack of progress in services. Although McAfee twice referred respondent for a parenting capacity examination, the first referral was denied due to respondent's lack of progress in services and the second was approved to begin in March 2025, again, well after the expiration of the second nine-month period.

¶ 133 Respondent also completed anger management classes but was rereferred for more classes after the November 2023 arrest, during which she admitted drinking alcohol and kicked a police officer in the stomach. While engaged with her second round of anger management classes, McAfee learned that respondent was untruthful about the status of her relationship with Malcolm and, as a result, she was required to complete additional classes. As of August 2024, well after the end of the second nine-month period, she had still not completed anger management classes.

¶ 134 During the first nine-month period, respondent largely attended her weekly visits, although she reportedly had issues with being prepared. McAfee testified that, from September

2023 to March 2024, which encompassed the second half of the second nine-month period, respondent attended only 6 out of 20 visits and arrived late for some of those visits she did attend. Although McAfee said that in June 2024, she would likely have deemed the home safe, that was five months after the expiration of the second nine-month period in January 2024. Respondent's visits with R.L. never advanced to unsupervised status.

¶ 135    The foregoing evidence amply supports the trial court's finding that respondent was unfit because she failed to make substantial progress toward the return of R.L. to her custody within the time periods alleged in the petition. We specifically note that, although McAfee testified that, at the time of the fitness portion of the termination proceedings, respondent had been approved for a parenting capacity assessment due to recent progress in cooperation and substance abuse services, she still had not completed counseling or anger management classes. McAfee also testified that she made the referral to "plan for two different outcomes."

¶ 136    We note that respondent specifically argues that "[her] progress was undermined by agency failures, not parental indifference," alleging that she was "denied mental health services at Memorial" and "turned away from Survivor Recovery due to waitlists." The evidence establishes, however, that these delays were caused by respondent herself, not the agency. The agency offered respondent a new counselor when her first counselor left, but respondent rejected that offer and opted to find one on her own and did not do so promptly, resulting in several months of delay until the agency intervened.

¶ 137    Respondent also alleges that she reported transportation barriers, work conflicts, and inconsistent communication from caseworkers. However, Beck testified that the agency offered respondent bus passes, which she declined. Additionally, respondent never provided Beck with a work schedule so Beck could avoid work conflicts, and respondent testified that she

only "recently" had begun providing her work schedule to McAfee. Beck testified that she communicated with respondent weekly and met with respondent more than she did with other parents in an effort to get respondent to engage so she could have R.L. returned to her care.

¶ 138    For these reasons, we emphatically reject respondent's assertions that DCFS (1) "set [respondent] up to fail" and (2) "failed to make reasonable efforts to facilitate reunification."

¶ 139    Last, respondent argues that "the trial court relied on speculative concerns about a relationship [with Malcolm] without affording a path to reunification." We initially note that respondent provides no authority for the proposition that the trial court cannot consider a paramour's need for services as part of its unfitness finding. Respondent asserts that "[t]ermination based upon the fear of a hypothetical risk is not permitted under Illinois law," but the case cited for that proposition, *In re C.P.*, 2018 IL App (4th) 180378, does not exist.

¶ 140    Even if such authority existed, the risk Malcolm posed to R.L. was not speculative or hypothetical. We point specifically to the November 2023 incident, during which, according to respondent's own testimony, he was drinking and hit her in the face and then chased her with an axe after she hit him back. She also testified that she believed he last drank four months before the termination proceedings and she had smoked marijuana with him a "couple days" before her testimony. Because respondent was in a relationship with Malcolm, he was required to complete services as part of R.L.'s reunification process. However, respondent hid her relationship with Malcolm from her caseworker and service providers for several months, delaying that process. And even after it was discovered, McAfee testified that he had not completed any domestic violence or anger management courses, although she had "laid out the things he [could] get started on."

¶ 141　　　　Accordingly, we affirm the trial court's finding that respondent was unfit.

¶ 142　　　　　　　　D. The Trial Court's Best Interest Finding

¶ 143　　　　　　　　1. *The Applicable Law and Standard of Review*

¶ 144　　　　At the best interest stage of a termination proceeding, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71. In reaching a best interest determination, the trial court must consider, within the context of the child's age and developmental needs, the following factors:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." (Internal quotation marks omitted.) *In re J.B.*, 2019 IL App (4th) 190537, ¶ 32.

See 705 ILCS 405/1-3(4.05) (West 2024).

¶ 145　　　　A reviewing court affords great deference to a trial court's best interest finding because the trial court is in a superior position to view the witnesses and judge their credibility. *C.P.*, 2019 IL App (4th) 190420, ¶ 71. An appellate court "will not disturb the trial court's decision regarding a child's best interests *** unless it is against the manifest weight of the

evidence." *Id.* ¶ 68. A best interest determination is against the manifest weight of the evidence only when the opposite conclusion is clearly the proper result. *Id.*

¶ 146                                    2. *This Case*

¶ 147          The evidence in this case also supports the trial court's finding that it was in R.L.'s best interest to terminate respondent's parental rights.

¶ 148          R.L. was 16 months old when she was taken into care in November 2021 and has lived in the same foster home ever since. Her foster parents wish to adopt her. She has developed a "strong and secure" bond with them and calls them "[m]om and dad." R.L. has also developed a "very close" bond with her foster sister, as well as her foster parents' extended family, calling her foster grandparents "Gigi and Papa."

¶ 149          R.L.'s foster parents provide for her emotional needs. McAfee testified that she "looks to them in *** her moments of chaos for some peace." They also provide for her developmental needs. When she entered foster care, R.L. was unable to walk or communicate and was "very delayed," displaying developmental and behavioral delays. Her foster parents have taken her to occupational and speech therapy, as well as her pediatrician appointments. They also provide for her educational needs, having enrolled her in a pre-K program. In her foster parents' care, R.L. has "consistently improv[ed]," and "she just keeps excelling [beyond] everyone's expectations."

¶ 150          On the other hand, although R.L. has appeared to enjoy the time she has spent with respondent, she only recently began talking about her, calling her "new mommy." Throughout the case, respondent demonstrated an inability to be on time for visits, appointments, and even the termination proceedings. We do not doubt respondent loves her daughter and believes she can provide for her daughter's special needs, but the evidence establishes that R.L.'s

needs will be best served living in the stable, reliable home of her foster parents with the permanency that termination of respondent's parental rights provides.

¶ 151　　　　For the foregoing reasons, we conclude that the evidence supports the trial court's finding that it is in R.L.'s best interest to terminate respondent's parental rights.

¶ 152　　　　As a final point, we recognize that respondent specifically argues that "the [trial] court failed to consider less restrictive permanency alternatives," asserting that the trial court "was required to consider alternatives to permanent severance, such as subsidized guardianship." However, respondent again fails to cite any authority standing for this proposition. Respondent cites only *In re K.E.S.*, 347 Ill. App. 3d 452, 457 (2004), a proceeding under section 11-5(b) of the Probate Act (755 ILCS 5/11-5(b) (West 2002)), in which the natural mother petitioned to terminate the guardianship of her children by their uncle. The appellate court affirmed the trial court's denial of the mother's petition. *K.E.S.*, 347 Ill. App. 3d at 463. *K.E.S.* does not even come close to supporting respondent's argument in this case.

¶ 153　　　　　　　　　　　　　　E. Due Process

¶ 154　　　　Respondent also claims that "the termination proceeding was fundamentally unfair," arguing that she was denied a "fair and meaningful opportunity to preserve her parental rights" because she was "denied unsupervised visits, blocked from home-based reunification, and evaluated through the lens of a rigid agency perspective, not a holistic or child-centered lens." The evidence is to the contrary.

¶ 155　　　　Respondent failed to advance to unsupervised visits because of her own failure to progress in services and pass a home safety check. She concealed her relationship with Malcolm, which involved domestic violence and substance abuse, creating valid concerns about R.L.'s well-being with Malcolm in respondent's home. Likewise, the state of respondent's home

created valid concerns for R.L.'s safety if left unsupervised in R.L.'s home. Further, the evidence demonstrates that R.L.'s caseworkers and the trial court operated in this case based on R.L.'s best interest.

¶ 156 Accordingly, we reject respondent's conclusory assertion that the termination proceedings were fundamentally unfair.

¶ 157 We thank the trial court for its careful consideration of the circumstances of this case and its detailed discussion of its findings, which this court found helpful to the resolution of this appeal.

¶ 158 III. CONCLUSION

¶ 159 For the reasons stated, we affirm the trial court's judgment.

¶ 160 Affirmed.